**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Case No. 06-cv-01366-REB- BNB

CATHOLIC HEALTH INITIATIVES, COLORADO
d/b/a CENTURA HEALTH - ST. THOMAS MORE HOSPITAL,

      Plaintiff,

v.

ROBERT C. GROSS, D.O.,

      Defendant and Third-Party Plaintiff,

v.

MEDICAL EXECUTIVE COMMITTEE OF CATHOLIC HEALTH INITIATIVES
COLORADO d/b/a CENTURA HEALTH-ST. THOMAS MORE HOSPITAL, et al.,

      Third-Party Defendants.

---

## ORDER CONCERNING MOTIONS FOR SUMMARY JUDGMENT

---

**Blackburn, J.**

      This matter is before me on the following motions: 1) **MEC's Motion for Summary Judgment On Affirmative Defenses - Waiver and Failure To Exhaust Administrative Remedies** [#125]; 2) **Motion for Summary Judgment on Claims Against Individual MEC Members** [#127]; 3) **Centura's Motion for Summary Judgment on Gross' Counterclaims and Centura's Claim** [#126], all filed May 25, 2007; and 4) **Robert C. Gross, D.O.'s Motion for Summary Judgment** [#168], filed July 31, 2007. The defendant and third-party plaintiff, Dr. Robert C. Gross, D.O., filed responses [#179, #180, 181] to the motions filed by the plaintiff and by the third-party defendants. Additionally, Dr. Gross filed a combined surreply [#274-2]. Centura filed a

reply [#211 & 212] in support of its motion, and the third-party defendants, the Medical Executive Committee of the Medical Staff of Catholic Health Initiatives Colorado (MEC) and the individual MEC members, filed replies [#210 & #214] in support of their motions. Centura filed a motion to refuse Dr. Gross's motion for summary judgment [#192], in which Centura addresses some of the issues raised by Dr. Gross. Dr. Gross filed a response [#216] and Centura filed a reply [#227].

I grant Centura's motion summary judgment in part, and I deny that motion in part. I grant the motions for summary judgment filed by the MEC and by the individual members of the MEC. I deny Dr. Gross's motion for summary judgment.[1]

Many of the exhibits cited by the plaintiff, the defendant, and the third-party defendants are contained in a separate filing, titled *Exhibits To Motions for Summary Judgment and Declaration of Lauri Martin* [#129], filed May 25, 2007. That filing includes excerpts from Dr. Gross's deposition, and several exhibits to Dr. Gross's deposition. I will refer to the excerpts from Dr. Gross's deposition by page number, e.g., *Gross Depo.* p. 1. I will refer to the deposition exhibits by the designation given them in the deposition, e.g., *Gross Depo.* Ex. A. In addition, Dr. Gross's Amended Counterclaim and Third-Party Complaint [#39] (filed under seal December 1, 2006) (*Counterclaim & Third-Party Complaint*) includes exhibits A through M. I will refer to these exhibits by their exhibit designation, e.g., *Counterclaim & Third-Party Complaint*, Exhibit A. Dr. Gross attached 31 exhibits to his motion for summary judgment. Many of

---

[1] The issues raised by and inherent to the motions for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motions stand submitted on the briefs. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir.1988) (holding that the hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

these exhibits duplicate exhibits attached to the plaintiff's and the third-party defendants' motions, or attached to Dr. Gross's Counterclaim and Third-Party Complaint. Due to this duplication, I do not refer to the exhibits using the designations used by Dr. Gross in his motion for summary judgment. To the extent Dr. Gross's exhibits are not duplicated elsewhere in the record, I conclude that reference to those unique exhibits is not necessary to a resolution of the pending motions for summary judgment.

## I. JURISDICTION

I have jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) (diversity). The plaintiff's claim, the counterclaims, and the third-party claims are claims under the law of the State of Colorado.

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995). Once the motion has

been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. **Concrete Works**, 36 F.3d at 1518. All the evidence must be viewed in the light most favorable to the party opposing the motion. **Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services**, 165 F.3d 1321, 1326 (10th Cir.), **cert. denied**, 120 S.Ct. 53 (1999). However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. **Rice v. United States**, 166 F.3d 1088, 1092 (10th Cir.), **cert. denied**, 528 U.S. 933 (1999).

### III. SUMMARY OF FACTS & CLAIMS

A. Centura's Claim Against Dr. Gross

This case originated with a complaint filed by plaintiff, Catholic Health Initiatives Colorado d/b/a Centura Health-St. Thomas More Hospital (Centura), against defendant, Robert C. Gross, D.O. In April, 2003, the plaintiff and Dr. Gross executed a physician recruitment agreement which provided various incentives for Dr. Gross to practice medicine at a hospital operated by Centura, the St. Thomas More Hospital in Canon City, Colorado. Dr. Gross practiced at St. Thomas Moore Hospital for a time and then departed. Centura alleges that Dr. Gross breached the agreement and, thus, asserts in its Second Amended Complaint [#19], filed October 12, 2006, one claim for breach of contract against Dr. Gross.

B. Third-Party Claims Against the Medical Executive Committee

The Medical Executive Committee of Centura Health - St. Thomas More Hospital (MEC) is the entity authorized by Centrua to oversee medical staff functions, including

credentialing and ensuring adherence to the Medical Staff By-Laws. Dr. Gross's third-party claims against the MEC concern actions taken by the MEC concerning Dr. Gross's practice at Centura. The facts underlying these claims are, in large part, the same facts on which the other claims in this case are based. In Dr. Gross' Amended Counterclaim and Third-Party Complaint [#39], filed December 1, 2006 (*Counterclaim & Third-Party Complaint*), Dr. Gross asserts two claims against the MEC. First, he asserts a claim for breach of the implied duty of goof faith and fair dealing. Second, he asserts a claim for violation of due process and breach of Medical Staff By-Laws. The MEC has asserted two affirmative defenses as to both of these claims. Those affirmative defenses are waiver and failure to exhaust administrative remedies. In its motion for summary judgment, the MEC seeks judgment in its favor on both of Dr. Gross's claims against the MEC based on these affirmative defenses. I will address the MEC's motion for summary judgment first because resolution of the issues presented by the MEC informs the resolution of the other motions for summary judgment.

Unless noted otherwise Dr. Gross's claims against the MEC are based on the following undisputed facts. Dr. Gross and the hospital executed a physician recruitment agreement in April of 2003. *Counterclaim & Third-Party Complaint*, Exhibit A. Dr. Gross's practice at Centura was governed by the Medical Staff By-Laws. *Counterclaim & Third-Party Complaint*, Ex. B (By-Laws). After receiving independent peer review of the care provided by Dr. Gross to seven patients, the MEC invited Dr. Gross to respond to certain questions posed by the reviewer and requested that he appear at a November 3, 2004, MEC meeting. *Gross Depo.* Ex. G. Dr. Gross attended

the meeting, presented his position, and responded to questions.

In a letter dated November 10, 2004 (November 10th letter), the MEC required Dr. Gross to obtain an evaluation of his surgical skills by the Center for Personalized Education for Physicians (CPEP), and to follow any educational process recommended by CPEP. *Gross Depo.* Ex. H. In addition, the MEC required Dr. Gross to provide authorizations to CPEP to permit CPEP to contact the MEC concerning CPEP's evaluations, findings, and recommendations. *Id.* Pending the outcome of the CPEP evaluation, the MEC recommended that Dr. Gross voluntarily withdraw his privileges for surgical cases in which a bowel anastomosis is contemplated or that he continue to perform such procedures only with the assistance of a proctor under certain specified conditions. *Id.* The MEC told Dr. Gross that if he chose not to abide by the "requirements and recommendations" outlined in the letter, then the MEC would be required to take further immediate action, which could include summary suspension of his privileges to perform surgical bowel procedures. *Id.* The MEC requested a written response from Dr. Gross identifying his intentions within 24 hours of his receipt of the November 10, 2004, letter. *Id.*

On November 11, 2004, Dr. Gross sent a letter to the MEC in which he resigned from the medical staff of Centura, effective November 29, 2004. *Gross Depo.* Ex. I. Dr. Gross said in this letter that it was impossible to comply with the demands outlined in the MEC's November 10th letter. *Id.* In a letter dated November 15, 2004, the MEC noted Dr. Gross's resignation, and asked if Dr. Gross intended voluntarily to withdraw his privileges for bowel anastomosis surgery until his resignation became effective and whether he intended to participate in the CPEP evaluation. *Gross Depo.* Ex. J. On

November 16, 2004, Dr. Gross sent a second letter to the MEC in which Dr. Gross resigned from the Medical Staff of Centura, effective immediately. *Gross Depo.* Ex. K.

On November 17, 2004, Dr. Gross sent a third letter to the MEC. In this letter, he said he previously had not had sufficient time to consider his options and that after consideration, he withdrew his resignation. *Gross Depo.* Ex. L. Dr. Gross noted that he was "under investigation regarding the surgeries involving bowel anastomosis," said that he would participate in an evaluation and recommended educational processes with CPEP, and stated that he would agree to supervision by an outside independent surgeon for bowel anastomosis surgeries. *Id.* He said that he refused to withdraw voluntarily his privileges for surgical cases in which a bowel anastomosis was contemplated. *Id.*

The MEC responded with a letter dated November 22, 2004. *Gross Depo.* Ex. M. The MEC noted Dr. Gross's previous letters of resignation, dated November 11 and November 16, 2004, respectively. *Id.* The MEC said it considered Dr. Gross's resignations to be effective and said he would have to re-apply to obtain medical staff membership at the hospital. *Id.* Dr. Gross never submitted a new application for medical staff privileges, and he never requested a hearing from the MEC.

Dr. Gross's practice at Centura was governed by the Medical Staff By-laws of St. Thomas More Hospital. *Counterclaim & Third-Party Complaint, Ex. B (By-Laws).* The By-Laws provide for a variety of procedures for resolving issues of professional competence, conduct, or discipline. *By-Laws*, Chapters X and XI. Dr. Gross's third-party claims against the MEC are based on his allegation that the MEC failed to follow the hearing and other requirements of the By-Laws when the MEC sent the November

10th letter to Dr. Gross and when the MEC refused to permit Dr. Gross to withdraw his resignations. Dr. Gross's third-party claims and the relevant provisions of the By-Laws are detailed below.

### C. Third-Party Claims Against Individual MEC Members

Dr. Gross has named several individual members of the MEC as third-party defendants. He asserts two claims against the individual members of the MEC. First, he asserts a claim for breach of the implied duty of goof faith and fair dealing. Second, he asserts a claim for violation of due process and breach of medical staff by-laws. These two claims parallel Dr. Gross's two claims against the MEC. These claims are based on the same facts outlined above. The individual MEC members assert the same two affirmative defenses as the MEC, waiver and failure to exhaust administrative remedies. In addition, the individual members of the MEC argue that the By-Laws cannot be enforced against individual members of the MEC. The individual members of the MEC seek summary judgment in their favor on both of Dr. Gross's claims against them.

### D. Counterclaims Claims Against Centura

Dr. Gross asserts four counterclaims against Centura. First, he asserts a counterclaim for breach of the implied duty of goof faith and fair dealing. Second, he asserts a counterclaim for violation of due process and breach of Medical Staff By-Laws. These two claims parallel Dr. Gross's two claims against the MEC and the individual members of the MEC.

In his third counterclaim, Dr. Gross asserts a counterclaim for tortious interference with existing business opportunity. This counterclaim concerns false

statements allegedly made by Centura about Dr. Gross after Dr. Gross resigned from Centura. Dr. Gross was granted privileges at Memorial Hospital in Colorado Springs, Colorado, in September, 2004, before he left Centura. *Gross Depo*, p. 94. After Dr. Gross resigned his privileges at Centura in November, 2004, Dr. Gross's privileges at Memorial Hospital were suspended summarily on January 14, 2005, and Dr. Gross resigned his privileges at Memorial Hospital in July, 2005. *Gross Depo*. pp. 16, 94. In his third counterclaim, Dr. Gross alleges that members of Centura's "administration and medical staff made disparaging and false statements about Dr. Gross to Memorial [Hospital] employees and medical staff members" and that these statements were intentional and unjustified. He alleges further that these "disparaging comments contributed to the termination of Dr. Gross' medical staff privileges at Memorial." *Counterclaim & Third-Party Complaint*, ¶¶ 83 - 84.

In his fourth counterclaim, Dr. Gross asserts a counterclaim for tortious interference with prospective business opportunity. This counterclaim is based on a report made by Centura to the National Practitioner's Data Bank (NPDB). It is undisputed that in April, 2005, Centrua reported to the NPDB that Dr. Gross had resigned his medical staff privileges at Centrua while under investigation or to avoid an investigation. Dr. Gross alleges that this statement was untrue and was made in bad faith. Dr. Gross claims he had a reasonable expectation of entering into an employment relationship with several specified hospitals and alleges that "once these hospitals learned of [Centura's] NPDB report, they would not consider giving Dr. Gross medical staff privileges." *Counterclaim & Third-Party Complaint*, ¶¶ 89 - 90.

Centura asserts the affirmative defenses of waiver and failure to exhaust

administrative remedies as to each of these four counterclaims. In its motion for summary judgment, Centura seeks judgment in its favor on each of Dr. Gross's four counterclaims based on these affirmative defenses and on other grounds. In addition, Centura seeks summary judgment against Dr. Gross on Centrua's one claim against Dr. Gross for breach of contract.

## IV. MEC'S MOTION FOR SUMMARY JUDGMENT

If complete, adequate, and speedy administrative remedies are available, a party must pursue those remedies before filing a lawsuit concerning an administrative action. *See, e.g., City and County of Denver v. United Airlines, Inc.*, 8 P.3d 1206, 1212 (Colo. 2000). Generally, a court does not have subject matter jurisdiction to hear a civil action based on a claim for which administrative remedies have not been exhausted. *See, e.g., State v. Golden's Concrete Co.*, 962 P.2d 919, 923 (Colo. 1998). The parties do not dispute that the exhaustion requirement is applicable generally to challenges to an action taken by a professional review committee under the Colorado Professional Review Act, §§12-36.5-101 - 12-36.5-203, C.R.S. The peer review process in a private hospital, including the Centura hospital at issue here, is an extension of the authority of the Colorado State Board of Medical Examiners. §12-36.5-103(3)(a), C.R.S. Recently, the Colorado Supreme Court held that

> a physician must exhaust all peer review committee administrative
> remedies before seeking relief in court. This exhaustion requirement,
> found in subsections 12-36.5-106(7) and (8), applies even though the
> physician is seeking money damages for common law claims arising out
> of the process, rather than challenging the board's final decision.

*Crow v. Penrose-St. Francis Healthcare System*,169 P.3d 158, 161 (Colo. 2007).

The MEC argues that Dr. Gross's claims against it are barred because Dr. Gross

failed to exhaust his administrative remedies concerning the proposed limitation on his privileges and the investigation begun by the MEC. Dr. Gross foreclosed the exhaustion of his administrative remedies, the MEC asserts, when he resigned rather than permitting the MEC to complete the administrative process detailed in the By-Laws. Dr. Gross argues that the procedures used by the MEC in his case effectively deprived him of complete, adequate, and speedy administrative remedies. Because such remedies were not available, Dr. Gross asserts, he was not required to exhaust administrative remedies before filing a lawsuit concerning the actions of the MEC.

Again, Dr. Gross's practice at Centura was governed by the Medical Staff By-laws of St. Thomas More Hospital. *Counterclaim & Third-Party Complaint,* Ex. B (By-Laws). The By-Laws provide for a variety of procedures for resolving issues of professional competence, conduct, or disciplines. *By-Laws*, Chapters X and XI. These procedures include Education and Improvement, *By-Laws,* ¶ X.1, Routine Corrective Actions, *By-Laws,* ¶ X.2, Suspension, *By-Laws,* ¶ X.3, and Summary Suspension, *By-Laws,* ¶ X.4. Paragraph X.4 of the By-Laws provides for summary suspension of clinical privileges for "a period of not longer than fourteen (14) days, during which an investigation must be conducted to determine the need for a Professional Review Action." *By-Laws,* ¶ X.4.1.2. The By-Laws provide for certain procedures after a summary suspension, including a meeting of the MEC within 24 hours, and an interview with the involved physician. *By-Laws*, ¶ X.4.5. If the MEC "takes or recommends a professional review action as a result of a summary suspension, the (MEC) must give the Member prompt Notice of his right to request a hearing under the Fair Hearing Plan." *By-Laws,* ¶ X.4.6.

The term Professional Review Action is defined in ¶ I.1.17 of the By-Laws. A Professional Review Action is 1) any activity to determine whether a Physician may hold clinical privileges, to determine the scope of such privileges, or to modify such privileges, and 2) which is based on the competence or professional conduct of a physician that is harmful or potentially harmful to patients, and 3) when the action or recommendation affects or might affect adversely the clinical privileges of the physician. *By-Laws,* ¶¶ I.1.17.

The Fair Hearing Plan detailed in the By-Laws defines a physician's right to a hearing before the Medical Executive Committee concerning a Professional Review Action. *By-Laws*, Chapter XI. Paragraph XI.1 provides that no Professional Review Action may be taken unless it is taken after the notice and hearing procedures provided in the By-Laws. However, the By-Laws provide also that a physician has no right to a hearing when "the action will not adversely affect his Medical Staff membership or clinical privileges." *By-Laws, ¶ XI.2.2.* The By-Laws define the term "Affect Adversely" to mean "reducing, restricting, suspending, revoking, denying, or failing to renew Medical Staff membership or clinical privileges." *By-Laws,* ¶ I.1.2.

The By-Laws also except certain specified actions from the hearing requirement. First, if the MEC conducts an investigation to determine the need for a corrective action,

> (n)either the discussions with the Member, nor any subsequent interview or meeting held as part of the above Investigations, constitutes a hearing and does not entitle the Member to any right sunder the Fair Hearing Plan.

*By-Laws,* ¶ X.2.3.4. Second, if the MEC imposes a summary suspension, then the MEC must meet within 24 hours after a summary suspension. *By-Laws,* ¶ X.4.5. At

this meeting, the MEC may decide to conduct

> such additional investigation as may be necessary, not to exceed fourteen (14) days from the date of the original imposition. <u>Such Investigation is not a hearing and does not afford a Member rights under the Fair Hearing Plan.</u> At the end of the investigation or fourteen (14) days, whichever occurs first, the MEC must take one of the actions specified in the immediately preceding two subsections [dissolve suspension or continue suspension]."

*By-Laws,* ¶ X.4.5.3 (emphasis added). Third, the Fair Hearing Plan detailed in Chapter XI of the By-Laws includes a similar provision:

> For a period of not longer than fourteen (14) days, during which it [the MEC] conducts an investigation to determine the need for a Professional Review Action, no hearing is required if no Professional Review Action is recommended or taken.

*By-Laws*, ¶ XI.2.3.2 .

It is undisputed that the MEC did not provide Dr. Gross with a notice of his right to a hearing with the November 10th letter. Dr. Gross says he did not know he was entitled to a hearing following his receipt of the November 10th letter. According to Dr. Gross, his lack of knowledge of his hearing rights and the MEC's failure to give him notice of his hearing rights deprived him of complete, adequate, and speedy administrative remedies and made his resignations unknowing and involuntary.

The content of the applicable By-Laws and the content and timing of the series of letters exchanged between Dr. Gross and the MEC between October 27, 2004, and November 22, 2004, are not disputed. The November 10th letter from the MEC to Dr. Gross states the MEC's requirement that Dr. Gross participate in a CPEP evaluation, and that he permit CPEP to submit its evaluations, findings, and recommendations to the MEC. The MEC recommended also that Dr. Gross voluntarily withdraw his privileges for surgical cases in which bowel anastomosis is contemplated or that he

obtain the assistance of a proctor for such cases. The letter notes that if Dr. Gross refused to abide by the requirements and recommendations in the letter, then the MEC would take further action, which could include suspension of his privileges to perform surgical bowel procedures.

I conclude as a matter of law that the November 10th letter from the MEC to Dr. Gross did not trigger his hearing rights under the By-Laws, and, thus, did not trigger the requirement that Dr. Gross be given notice of his hearing rights. The actions and procedures outlined in the November 10th letter readily fall within the specific provisions of the By-Laws that cover actions involving investigation of the need for a routine corrective action. *By-Laws* ,¶ X.2.3.3. After routine corrective action, suspension of a physician's privileges, including summary suspension, is the next, ingravescent level of action provided in the By-Laws. *By-Laws,* ¶ ¶ X.3 - X.4. Generally, a suspension may occur while the MEC considers the imposition of a Professional Review Action. *Id.* The November 10th letter describes an evaluation of certain of Dr. Gross's cases conducted by an ad hoc subcommittee. The use of an ad hoc subcommittee is part of the preliminary investigation procedures outlined in the By-Laws concerning routine corrective actions. *By-Laws,* ¶ X.2.3.3.1. The letter outlines clearly the MEC's intent to obtain "evaluations, findings and suggested recommendations" from CPEP, a stated purpose that is consistent with a continuing investigation of Dr. Gross. No reasonable reading of the November 10th letter could lead to the conclusion suggested by Dr. Gross, that the MEC's investigation of Dr. Gross was complete as of November 10, 2004. *Gross Response*, pp. 10 - 11.

In its letter, the MEC does not explicitly impose a partial suspension of

privileges. Rather, the MEC asks Dr. Gross voluntarily to accept specific limitations on his privileges during the ongoing investigation. In the concluding paragraph, the MEC indicates that it will take further action, possibly including summary suspension of Dr. Gross's privileges to perform surgical bowel procedures, if he decides "not to abide by the above requirements and recommendations." *Gross Depo.* Ex. H.

Again, under the provisions of the By-Laws specifically applicable to investigations and summary suspensions of privileges, a physician is not entitled to a hearing during such proceedings. *By-Laws*, ¶¶ X.2 through X.4. The November 10th letter clearly indicates that an investigation is ongoing, and the investigation did not trigger a right to a hearing. Even if the MEC had summarily suspended Dr. Gross's privileges concerning bowel anastomosis surgeries, Dr. Gross would not have been entitled to a hearing. *By-Laws,* ¶ X.4.5.3. In the November 10th letter, the MEC stopped just short of a summary suspension, seeking voluntary compliance from Dr. Gross instead. If a summary suspension does not trigger a right to a hearing, then, *a fortiori*, the MEC's request for voluntary compliance as an alternative to summary suspension cannot trigger Dr. Gross's right to a hearing under the By-Laws.

Dr. Gross argues that his right to a hearing and notice of his hearing rights was triggered under the more general hearing provisions of the By-Laws. He argues that the terms of the November 10th letter constitute a Professional Review Action because the requirements of the letter affected or might have affected adversely his clinical privileges. *By-Laws,* ¶ I.1.17. He notes that the Fair Hearing Plan provisions of the By-Laws provide that no Professional Review Action may be taken until the notice and hearing procedures of the By-Laws have been followed. *By-Laws,* ¶ XI.1. In isolation,

these provisions of the By-Laws myopically can be read to support Dr. Gross's position. However, these provisions of the By-Laws may not be read properly in isolation. The By-Laws must be read and construed as a whole. When read as a whole, the By-Laws provide specific exceptions to the general hearing requirement, which exceptions are applicable to investigations and summary suspensions. When applicable, these specific provisions control over the more general provisions. These specific provisions are applicable directly to the procedures outlined in the November 10th letter. Under these specific provisions of the By-Laws, outlined above, Dr. Gross was not entitled to a hearing or notice of his hearing rights based on the November 10th letter.

Dr. Gross claims that the MEC's failure to provide him notice of his hearing rights "corrupted the review process and made Dr. Gros' subsequent resignation attempt unknowing and involuntary." *Gross Response*, pp. 11 - 12. He claims also that the MEC prevented him from exhausting his administrative remedies because the MEC required him to follow procedures that were inconsistent with the By-Laws. *Gross Response*, pp. 13 - 14. Requiring such inconsistent procedures, Dr. Gross argues, made administrative remedies unavailable to him.

I disagree with these arguments. Again, the MEC did not require Dr. Gross to follow procedures that were inconsistent with the By-Laws. Neither the ongoing investigation nor the request for a voluntary suspension of his privileges, as an alternative to a summary suspension of privileges, triggered any hearing rights under the By-Laws. To exhaust his administrative remedies, Dr. Gross was required to permit the preliminary proceedings outlined in the November 10th letter to proceed. If those proceedings progressed to the point where a hearing was required, then Dr. Gross

would have been required to complete the hearing process, assuming the MEC continued to follow proper procedures. The path through the administrative process is laid out clearly in the By-Laws, and the November 10th letter indicated that the MEC had barely begun to progress down that path. Although the MEC had followed proper procedures to this point, Dr. Gross unilaterally interrupted the administrative process by submitting his two letters of resignation.

The undisputed facts in the record demonstrate that complete, adequate, and speedy administrative were available under the By-Laws, that the MEC did not deviate from the procedures required by the By-Laws, and that it did not deceive Dr. Gross about his right to a hearing under the By-Laws. After receiving the November 10th letter, Dr. Gross chose to stop the nascent administrative process by submitting his two letters of resignation. The undisputed facts in the record demonstrate that Dr. Gross failed to exhaust his administrative remedies concerning the MEC's actions. Therefore, this court does not have subject matter jurisdiction over Dr. Gross's claims that challenge the propriety of the MEC's actions concerning Dr. Gross, and Dr. Gross's claims challenging the actions of the MEC are barred. *City and County of Denver v. United Airlines, Inc.*, 8 P.3d 1206, 1212 (Colo. 2000); *State v. Golden's Concrete Co.*, 962 P.2d 919, 923 (Colo. 1998); *Crow v. Penrose-St. Francis Healthcare System*, 169 P.3d 158, 161 (Colo. 2007). Thus, the MEC is entitled to summary judgment on Dr. Gross's third-party claims against the MEC.

## V. INDIVIDUAL MEC MEMBERS' MOTION FOR SUMMARY JUDGMENT

The third-party defendants who are individual members of the MEC have asserted the same affirmative defenses as the MEC, waiver and failure to exhaust

administrative remedies. Based on the same facts and law cited by the MEC in its motion for summary judgment, the individual members of the MEC also seek summary judgment. Based on my analysis of the MEC's affirmative defense of failure to exhaust administrative remedies, as outlined above, the individual members of the MEC are entitled also to summary judgment on Dr. Gross's third-party claims against them. The undisputed facts in the record demonstrate that Dr. Gross failed to exhaust his administrative remedies concerning the MEC's actions. Therefore, this court does not have subject matter jurisdiction over Dr. Gross's claims which challenge the propriety of the actions of the individual members of the MEC, and these claims are barred.

The individual members of the MEC assert also that the By-Laws cannot be enforced against individual MEC members. In view of my conclusion that Dr. Gross's claims are barred by his failure to exhaust administrative remedies, I need not address the issue of the enforcement of the By-Laws against individual members of the MEC.

## VI.  CENTURA'S MOTION FOR SUMMARY JUDGMENT

### A.  Dr. Gross's Counterclaims Against Centura

Again, Dr. Gross asserts four counterclaims against Centura: 1) breach of the implied duty of goof faith and fair dealing; 2) violation of due process and breach of medical staff by-laws; 3) tortious interference with existing business opportunity; and 4) tortious interference with prospective business opportunity. The first two counterclaims parallel Dr. Gross's two third-party claims against the MEC and the individual members of the MEC. Based on my analysis of the MEC's affirmative defense of failure to exhaust administrative remedies, as outlined above, Centura is entitled to summary judgment on Dr. Gross's first and second counterclaims. The undisputed facts in the

record demonstrate that Dr. Gross failed to exhaust his administrative remedies concerning the MEC's actions. To the extent Dr. Gross properly may be able to assert these claims against Centura, based on the MEC's actions, I conclude that Dr. Gross has failed to exhaust his administrative remedies. Therefore, this court does not have subject matter jurisdiction over Dr. Gross's first and second counterclaims against Centura, and these claims are barred.

Dr. Gross's third counterclaim against Centura for tortious interference with existing business opportunity concerns Dr. Gross's practice at Memorial Hospital in Colorado Springs after he left Centura. This claim centers on Dr. Gross's allegation that after he left Centura and began to practice at Memorial Hospital, members of Centura's "administration and medical staff made disparaging and false statements about Dr. Gross to Memorial [Hospital] employees or medical staff members," which statements contributed to the termination of Dr. Gross's medical staff privileges at Memorial Hospital. *Counterclaim and Third-Party Complaint*, ¶ 83. Dr. Gross's fourth counterclaim for tortious interference with prospective business advantage concerns a report made by Centura to the National Practitioner's Data Bank (NPDB). It is undisputed that in April, 2005, Centrua reported to the NPDB that Dr. Gross had resigned his medical staff privileges at Centrua while under investigation or to avoid an investigation. Dr. Gross alleges that this statement was untrue and was made in bad faith.

Centura asserts the affirmative defenses of waiver and failure to exhaust administrative remedies as to Dr. Gross's third and fourth counterclaims. I conclude that these affirmative defenses are not applicable to Dr. Gross's third and fourth

counterclaims against Centura because these two counterclaims do not challenge directly the administrative process undertaken by and the determinations made by the Centura MEC. Rather, these claims concern the truth and propriety of statements allegedly made by Centura after Dr. Gross had resigned his privileges at Centura. The truth and propriety of these alleged statements were not at issue directly in the MEC's administrative process.

Other than addressing the applicability of its affirmative defenses to the third counterclaim, Centura presents only very brief argument concerning this counterclaim. To establish his claim for tortious interference with existing business opportunity, Dr. Gross must show that 1) he had a business relationship with Memorial Hospital; 2) Centura knew of the relationship; 3) Centura, by words or conduct, interfered with the relationship, causing Memorial Hospital to terminate the relationship; 4) Centura's interference was improper; and 5) the interference caused Dr. Gross damages. CJI-Civ. 4th 24:1, and the concomitant *Notes on Use* and *Source and Authority*.

Centura notes that Dr. Gross resigned his privileges at Memorial Hospital and failed to exhaust his administrative remedies at Memorial Hospital. Centura argues that it is inconsistent for Dr. Gross to resign his privileges at Memorial and then to blame Centura for the loss of his privileges at Memorial. Centura notes further that Dr. Gross voluntarily surrendered his license to practice medicine in Colorado, and, thus, argues that Dr. Gross cannot blame Centura for his inability to practice medicine at Memorial Hospital or elsewhere in Colorado.

I conclude that Centura has not established that it is entitled to judgment as a matter of law on Dr. Gross's third counterclaim. Dr. Gross alleges broadly that

members of Centura's "administration and medical staff made disparaging and false statements about Dr. Gross to Memorial [Hospital] employees and medical staff members" and that these statements were intentional and unjustified.  The factual and evidentiary bases underlying these allegations, including the content of the alleged false and disparaging statements, are not detailed in Dr. Gross's allegations, the evidence, or the briefing.  Dr. Gross alleges these unspecified "disparaging comments contributed to the termination of Dr. Gross' medical staff privileges at Memorial." *Counterclaim & Third-Party Complaint*, ¶¶ 83 - 84.

I note that Dr. Gross testified that the summary suspension of his privileges at Memorial Hospital occurred on January 14, 2005, and he resigned his privileges at Memorial Hospital in July, 2005.  *Gross Depo.*, pp. 16, 94.  Although it is far from clear on the current record, it is conceivable that Dr. Gross could have suffered compensable damages in the time between the alleged disparaging and false statements and his resignation of his privileges at Memorial Hospital.  The parties have not addressed this question with evidence or argument.  Even if I assume that Centura is correct that Dr. Gross cannot seek damages based on events occurring after his resignation from Memorial, the current record does not indicate whether or not Dr. Gross suffered any damages after the alleged false and disparaging statements were made but before his resignation.  Centura has not argued that Dr. Gross does not have any evidence of damages.

I conclude that Centura has demonstrated that it is entitled to summary judgment on Dr. Gross's fourth counterclaim, in which he asserts a claim for tortious interference with prospective business advantage.  This counterclaim is based on a report made by

Centura to the National Practitioner's Data Bank (NPDB). It is undisputed that in April, 2005, Centrua reported to the NPDB that Dr. Gross had resigned his medical staff privileges at Centrua while under investigation or to avoid an investigation. Dr. Gross alleges that this statement was untrue and was made in bad faith.

The elements of this claim are nearly identical to the elements of the third counterclaim. To establish tortious interference with prospective business advantage, Dr. Gross must show that 1) he had a reasonable expectation of a prospective business relationship with one or more hospitals; 2) Centura knew of these prospective relationships; 3) Centura, by words or conduct, interfered with these prospective relationships, causing one or more of the hospitals to refuse to consider entering into a business relationship with Dr. Gross; 4) that Centura's interference was improper; and 5) that the interference caused Dr. Gross damages. CJI-Civ. 4th 24:1, and the concomitant *Notes on Use* and *Source and Authority*. Colorado follows the definition of this claim provided in § 766B of the Restatement (Second) of Torts (1979). **Amoco Oil Co. v. Ervin**, 908 P.2d 493, 500 (Colo.1995).

Dr. Gross argues that Centura is not entitled to summary judgment on this claim because there are disputed issues of material fact about the truthfulness of Centura's report to the NPDB, and about Centura's retaliatory motive in making the report to the NPDB. Both of these issues are relevant to the alleged impropriety of Centura's report to the NPDB. *Restatement (Second) of Torts* § 767 (1979), comments c and d. As outlined above concerning Dr. Gross's third-party claims against the MEC, I conclude that the undisputed facts in the record demonstrate that Dr. Gross was under investigation under the By-Laws when he received the November 10th letter. The

investigation described in the November 10th letter had not been suspended or terminated when Dr. Gross tendered his two letters of resignation dated November 11 and November 16, 2004. In short, the undisputed facts in the record demonstrate that Dr. Gross was under investigation when he resigned. Stated otherwise, the undisputed facts in the record demonstrate that Centura's report to the NPDB indicating that Dr. Gross resigned while under investigation was truthful.

When the truth of an NPDB report is not in question, the person or entity making the NPDB report is immune from liability in a civil action based on the NPDB report.

> No person or entity (including the agency designated under section 11134(b) of this title) shall be held liable in any civil action with respect to any report made under this subchapter (including information provided under subsection (a) of this section [ ] ] without knowledge of the falsity of the information contained in the report.

42 U.S.C.A. § 11137 (footnote concerning omitted closing parenthesis omitted). The undisputed facts in the record demonstrate that Centura's NPDP report concerning Dr. Gross was true. Given these circumstances, Centura is immune from liability on Dr. Gross's fourth counterclaim, and Centura is entitled to summary judgment on this claim. I do not address Centura's other arguments concerning this claim because Centura's statutory immunity is dispositive of this claim.

### B. Centura's Claim Against Dr. Gross

Centura argues that it is entitled to summary judgment against Dr. Gross on Centrua's breach of contract claim. This claim is based on the recruitment agreement between Centura and Dr. Gross. *Gross Depo.*, Ex. A. Centura has outlined the facts that it claims to be undisputed and that support the entry of summary judgment on this claim. *Centura's Motion for Summary Judgment on Gross' Counterclaims and*

*Centura's Claim* [#126], filed May 25, 2007, pp. 12 - 13. Dr. Gross does not dispute Centura's statement of undisputed facts, but argues that his affirmative defenses of unclean hands, estoppel, and bad faith defeat Centura's breach of contract claim. *Robert C. Gross, D.O.'s Response in Opposition To Centura's Motion for Summary Judgment on Dr. Gross' Counterclaim and Centura's Claim* [#179], filed August 14, 2007, p. 19.

The following relevant facts are undisputed. Centura and Dr. Gross executed the recruitment agreement. The recruitment agreement provides that Centura would advance certain funds to Dr. Gross and that Dr. Gross would repay funds advanced to him if he did not continue to maintain medical staff privileges at Centura and to practice medicine in Canon City for the two-year forgiveness period. Dr. Gross executed two promissory notes reflecting the amounts advanced to him under the recruitment agreement. *Gross Depo.*, Exs. 14 & 15. Centura advanced $205,468 to Dr. Gross under the agreement, and $59,928.19 were forgiven under the terms of the agreement based on Dr. Gross's practice at Centura through November, 2004. Dr. Gross resigned his privileges at Centura in November, 2004, and ceased practicing medicine in Canon City prior to December 1, 2004.

By resigning his medical staff privileges at Centura and by ceasing to practice medicine in Canon City, Dr. Gross violated his obligations under Sections 1.2 and 1.3 of the recruitment agreement. Under Article II of the recruitment agreement, Dr. Gross is required to repay to Centura the income guarantee payments and start-up expense payments made to him. Those payments need not be repaid by Dr. Gross to the extent repayment previously has been forgiven under the terms of the agreement or

previously have been repaid. *Gross Depo.*, Ex. A, Section II. Dr. Gross agrees that, if he breached the agreement and there is no valid defense to his breach, then he is obligated to repay $145,539.81 in income guarantee and expense reimbursement payments, plus interest accruing from May 1, 2003. Under the terms of the promissory notes executed by Dr. Gross, interest on any amounts due accrues at 4.25 percent per annum, plus a five percent per annum default rate, for a total interest rate of 9.25 percent per annum. The promissory notes provide also that Dr. Gross is liable for all attorney fees and costs of collection if he is in default. It is undisputed that certain amounts due under the recruitment agreement and related promissory notes have been forgiven and that Dr. Gross has not made any repayment of the amounts due under the recruitment agreement and promissory notes.

Dr. Gross's affirmative defenses of unclean hands, estoppel, and bad faith are based on his claim that the MEC and Centrua failed to abide by the procedural requirements of the By-Laws, as described in my discussion of the third-party claims against the MEC. Dr. Gross argues that these failures made it impossible for him to perform his obligations under the recruitment agreement and that these failures deceived Dr. Gross into resigning his privileges. He argues that Centura should not be permitted to take advantage of this wrongdoing. As discussed above, the undisputed facts in the record demonstrate that the MEC complied with the requirements of the By-Laws and that Dr. Gross resigned his privileges at Centura before the MEC's administrative process could be completed. The undisputed facts in the record do not support Dr. Gross's claim that the MEC or Centrua prevented him from complying with his obligations under the recruitment agreement. Rather, as detailed above, the

undisputed facts in the record show that Dr. Gross chose to resign his privileges when the MEC investigation was under way.

Even when viewed in the light most favorable to Dr. Gross, the undisputed facts in the record do not support Dr. Gross's affirmative defenses of unclean hands, estoppel, and bad faith. Absent some basis for these affirmative defenses, the undisputed facts in the record, facts conceded by Dr. Gross, demonstrate that Dr. Gross breached the terms of the recruitment agreement and the promissory notes.

Because Dr. Gross has no valid defense to Centura's breach of contract claim, then it is undisputed that Centrua is owed $145,539.81 under the terms of the recruitment agreement and promissory notes, with interest accruing on that amount at 9.25 percent per annum from the date of Dr. Gross's default. Dr. Gross also is obligated to pay Centrua's attorney fees and costs of collection, but these amounts are not established in the record. Given these circumstances, I grant Centura's motion for summary judgment on the issue of Dr. Gross's liability on Centura's claim for breach of contract. However, before entering a judgment for a specific amount of damages due to Centura on this claim, I will invite further briefing to determine the amounts due for attorney fees and costs of collection on Centura's claim for breach of contract.

## VII. DR. GROSS'S MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment, Dr. Gross seeks judgment in his favor on Centura's breach of contract claim, judgment in his favor on his first, second, and fourth counterclaims, and judgment in his favor on his first, second, third, and fourth third-party claims. In his motion for summary judgment, Dr. Gross discusses essentially the same evidence and the same issues as discussed in the other motions for summary

judgment and in this order.  For the reasons detailed in this order, I conclude that Dr. Gross is not entitled to summary judgment on any of the claims specified in his motion for summary judgment.

Dr. Gross argues also that he has not been permitted to complete discovery and that he cannot fully address the issues presented in the various motions for summary judgment until certain specified discovery issues have been resolved.  I have reviewed the discovery issues specified by Dr. Gross, and I have reviewed and resolved the pending objections to the discovery orders entered by the Magistrate Judge in this case.  I conclude that there is no pending discovery to which Dr. Gross is entitled.  There is no pending and incomplete discovery that precludes the resolution of any of the motions for summary judgment addressed in this order.

## VIII.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the **MEC's Motion for Summary Judgment On Affirmative Defenses - Waiver and Failure To Exhaust Administrative Remedies** [#125], filed May 25, 2007, is **GRANTED**;

2. That Dr. Gross's third-party claims against the MEC, as stated in **Dr. Gross' Amended Counterclaim and Third-Party Complaint** [#39], filed December 1, 2006, are **DISMISSED**;

3. That the **Motion for Summary Judgment on Claims Against Individual MEC Members** [#127],filed May 25, 2007, is **GRANTED**;

4. That Dr. Gross's third-party claims against the individual members of the MEC, as stated in **Dr. Gross' Amended Counterclaim and Third-Party Complaint**

[#39], filed December 1, 2006, are **DISMISSED**;

5. That **Centura's Motion for Summary Judgment on Gross' Counterclaims and Centura's Claim** [#126], filed May 25, 2007, is **GRANTED** as to Dr. Gross's first, second, and fourth counterclaims against Centura, asserting claims for breach of the implied duty of good faith and fair dealing, for violation of due process and breach of Medical Staff By -Laws, and for tortious interference with prospective business opportunity;

6. That **Centura's Motion for Summary Judgment on Gross' Counterclaims and Centura's Claim** [#126], filed May 25, 2007, is **GRANTED** on the issue of Dr. Gross's liability on Centura's claim against Dr. Gross for breach of contract, as stated in Centura's **Second Amended Complaint** [#19], filed October 12, 2006;

7. That a determination of reasonable attorney fees and costs of collection due to Centura on its claim for breach of contract shall be made after further briefing from the parties on these issues;

8. That if Centura seeks to include reasonable attorney fees and costs of collection in the final judgment on its claim for breach of contract, then Centura **SHALL FILE** on or before **January 3, 2008**, a brief of no more than eight (8) pages circumstantiating the bases for its claim for reasonable attorney fees and costs; provided, furthermore, that any response and reply shall be filed in the time and manner required by D.C.COLO.LCivR 7.1C and be limited to eight (8) pages;

9. That **Centura's Motion for Summary Judgment on Gross' Counterclaims and Centura's Claim** [#126], filed May 25, 2007, is **DENIED** as to Dr. Gross's third counterclaim, asserting a claim for tortious interference with existing business

opportunity, as stated in **Dr. Gross' Amended Counterclaim and Third-Party Complaint** [#39], filed December 1, 2006; and

10.  That **Robert C. Gross, D.O.'s Motion for Summary Judgment** [#168], filed July 31, 2007, is **DENIED**.

Dated December 13, 2007, at Denver, Colorado.

BY THE COURT:

s/ Robert E. Blackburn
Robert E. Blackburn
United States District Judge